UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JOSHUA LEE VINSON, SR.,

                Plaintiff,

v.                                                      Case No. 19-cv-1237-pp

JASON DEBRUIN, *et al.*,

                Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION TO AMEND COMPLAINT (DKT. NO. 45) AND SCREENING AMENDED COMPLAINT UNDER 28 U.S.C. §1915A**

---

Plaintiff Joshua Lee Vinson, Sr., an inmate at Columbia Correctional Institution who is representing himself, is proceeding on claims against the defendants based on his allegations that they used excessive force when they arrested him. Dkt. No. 10. On April 28, 2020, the plaintiff filed a motion for leave to amend his complaint. Dkt. No. 45. As required by Civil Local Rule 15, the plaintiff attached a proposed amended complaint. Dkt. No. 45-1. The next day, Magistrate Judge William Duffin, to whom the court had referred the case for the handling of pretrial matters, ordered the plaintiff to supplement his amended complaint to include a demand for relief as Federal Rule of Civil Procedure 8 requires. Dkt. No. 46. Judge Duffin informed the plaintiff that after he supplemented his amended complaint, this court would screen the amended complaint under 28 U.S.C. §1915A. Id. at 2. On May 6, 2020, the plaintiff supplemented his amended complaint with a demand for relief. Dkt. No. 47.

1

In his motion seeking leave to amend the complaint, the plaintiff explained that he wanted to add new parties, add details about the circumstances that led to his arrest and state new claims based on his assertions that officers improperly stopped and searched his vehicle and arrested him. Dkt. No. 45. Under Fed. R. Civ. P. 15, courts should freely give plaintiffs leave to amend their complaints when justice so requires. There is no reason the court should not allow the plaintiff to amend his complaint, so the court will grant the motion. The court will order that the proposed amended complaint (dkt. no. 45-1, along with the plaintiff's demand for relief at dkt. no. 47) is now the operative complaint. The court will screen the amended complaint as 28 U.S.C. §1915A requires.

**I.     Screening the Complaint**

    A.     <u>Federal Screening Standard</u>

The court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

To state a claim for relief under the federal notice pleading standard, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

2

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)).

The court liberally construes complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.   The Plaintiff's Allegations

The plaintiff is suing five Racine police officers: Justin Schmidt-Quist, Stephen Jaskowiak, Jason DeBruin, Steven Fish and a John Doe officer who handled a police dog. Dkt. No. 45-1 at 1. The plaintiff alleges that, on February 19, 2015 at about 11 p.m., Schmidt-Quist and Jaskowiak saw the plaintiff, a Black male, drive past their unmarked squad car. Id. The plaintiff says they decided to pursue him without probable cause. Id. They stopped his car, but the plaintiff explains that he was wearing his seatbelt and hadn't violated any traffic laws. Id.

The plaintiff says he was confused, not understanding why they stopped him. Id. He says he saw the officers walking toward his car with their weapons unholstered; he rolled down his driver's side window "in total fear for [his] life,"

3

Case 2:19-cv-01237-PP-WED   Filed 10/28/20   Page 3 of 11   Document 52

holding his driver's license out the window "in hope the officers wouldn't harm or kill [him.]" Id.

The plaintiff states that Schmidt-Quist walked up to the driver's side window, ignored the license that the plaintiff was trying to hand him, flashed a light in his face and around the vehicle, all while holding his weapon and never introducing himself or identifying himself as a police officer. Id. The plaintiff alleges that Jaskowiak was on the passenger side, holding his weapon and peering into the car with his flashlight, never introducing himself or identifying himself as an officer. Id.

The plaintiff asserts that, fearing for his life, he pleaded with Schmidt-Quist to take his license. Id. Schmidt-Quist allegedly did not take the plaintiff's license, but asked, "Whos[e] vehicle [is] this?" and told the plaintiff to put both hands on the steering wheel. Id. The plaintiff asserts that he complied, while still holding his driver's license. Id.

The plaintiff explains that he told Schmidt-Quist that the vehicle belonged to his girlfriend and asked if he could please just call her. Id. The plaintiff called his girlfriend on speaker phone, and after his girlfriend confirmed it was her car, Schmidt-Quist asked him to hang up the phone. Id. at 1-2. The plaintiff states that he complied, and again tried to hand Schmidt-Quist his license. Id. at 2.

The plaintiff alleges that at that point, Schmidt-Quist then holstered his weapon, stuck his arm in the driver's side window, opened the door and yelled, "Get your Black ass out the car!" Id. Jaskowiak allegedly pointed his gun at the

4

plaintiff through the closed front passenger window. Id. The plaintiff states that Schmidt-Quist tackled and punched him in the head while the plaintiff was still in his seatbelt. Id. The plaintiff says he saw Jaskowiak trying to break the passenger-side window while DeBruin broke out the back driver's-side window and started to punch the plaintiff in the back of his head and neck over the seat. Id. The plaintiff says DeBruin then ran to the front passenger-side window, broke it, opened the door and started grabbing and punching the plaintiff at the same time that Schmidt-Quist was doing so. Id. The plaintiff says that Jaskowiak ran to the back driver's-side window, holstered his weapon and deployed his taser while yelling, "Black Motha Fucker!" Id. The plaintiff alleges that Jaskowiak tasered him "with no regard for [the plaintiff's] life, with enough probe to cause neuromuscular incapacitation, in the back of [his] neck on [his] spine, again and again, and finally deploying his taser again until [the plaintiff] was no longer breathing." Id.

The plaintiff asserts that before he stopped breathing, he observed and felt Schmidt-Quist, DeBruin and Fish "still" assaulting him in the front seat of the car. Id. The plaintiff asserts that DeBruin and Fish handcuffed his "limp lifeless hands above [his] head," Schmidt-Quist cut him out of his seatbelt and DeBruin and Fish pulled his "lifeless body out of the front passenger side door." Id.

The plaintiff asserts that "he came back to life when [his] head hit the cement, and [he] felt multiple kicks and punches to the body and a police dog biting [him], [he] had evacuated [his] bowels, and urinated on [himself]." Id. The

5

plaintiff states that his hands were now handcuffed behind his back. Id. The plaintiff contends that while he was on the ground, he told the officers that he was having chest pains, could not breath, his heart was hurting and his whole body felt numb. Id.

The plaintiff asserts that DeBruin and Fish picked him up off the ground to his feet and told him to shut up. Id. He says that DeBruin allegedly closed the handcuffs even tighter as DeBruin and Fish searched him without his consent, not knowing who he was because he was never identified by Schmidt-Quist or Jaskowiak. Id. The plaintiff says he tried to explain to Debruin what Schmidt-Quist and Jaskowiak did, and DeBruin said, "Shut the fuck up" and closed the handcuffs even tighter, causing the plaintiff "pain beyond belief as he threw [the plaintiff] in police van with no regards of [the plaintiff's] person on how [he] fell in, while [the plaintiff] was covered in urine and [his] evacuated bowels, and [DeBruin} slammed the van door." Id. at 2-3.

The plaintiff says he was in pain, having trouble breathing, with his heart hurting, covered in urine and feces, and that he was forced to sit in the police van for about thirty minutes wile all four officers, along with a police dog, searched his car, without probable cause. Id. at 3.

The plaintiff alleges that Schmidt-Quist and Jaskowiak drove him to the hospital. Id. On the way, Jaskowiak allegedly inflicted more pain on the plaintiff by pulling the plaintiff's hands up in the handcuffs, telling the plaintiff he "smelled like shit." Id. The plaintiff states the officers laughed at him and mocked him. Id.

6

The plaintiff says that once in the hospital, Schmidt-Quist and Jaskowiak handcuffed the plaintiff to the bed, making him lay in his own waste. Id. Jaskowiak allegedly told the plaintiff that they would take him out to the woods and kill him if he tried to tell anyone what they had done. Id. The plaintiff explains that the officers told him that they did all this because the plaintiff had a bulge in the right, front pocket of his pants, which the plaintiff asserts was "found to be a bit[e] size candy bar." Id.

The plaintiff asserts that he was arrested for and charged with resisting an officer. Id. The plaintiff says he was incarcerated and granted a $5,000 bond, but that the case was dismissed eighteen months later. Id.

The plaintiff states that he is always afraid for his life around police officers, and that he will be haunted by that night for the rest of his life. Id. at 4. He says that he is mentally distressed, emotionally injured, humiliated and always suffering from ongoing embarrassment. Id. For relief, the plaintiff seeks, $100,000,000 in damages, the firing of the officers, "injunctive damages," back pay, front-pay, pre-judgment interest, post-judgment interest and declaratory relief. Dkt. No. 47.

C.   Analysis

The Seventh Circuit Court of Appeals has explained that "[t]he Fourth Amendment protects against 'unreasonable searches and seizures,'" so "[w]henever police stop a vehicle, the stop must meet the Fourth Amendment's reasonableness requirement." United States v. Lewis, 920 F.3d 483, 489 (7th Cir. 2019) (citations omitted). "Generally, the decision to stop an automobile is

reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. (citations and internal quotation marks excluded). The court will allow the plaintiff to proceed on a Fourth Amendment claim against Schmidt-Quist and Jaskowiak based on his allegations that they had no reason to pull him over.

The court also will allow the plaintiff to proceed on an equal protection claim against these officers. The plaintiff does not specifically allege this theory in his amended complaint, but his allegations that he is a Black male, that Schmidt-Quist refused to take his driver's license and then yelled at the plaintiff to "get [his] Black ass out the car" are sufficient to state a claim on this basis. See Sow v. Fortville Police Dept., 636 F.3d 293, 303 (7th Cir. 2011) ("Racial profiling, or selective enforcement of the law, is a violation of the Equal Protection Clause.")

"An officer who reasonably starts a traffic stop . . . might violate the Constitution if he exceeds the scope or unreasonably prolongs the stop." Lewis, 920 F.3d at 491. Even if Schmidt-Quist and Jaskowiak had probable cause to initiate the stop (which the plaintiff says they did not), the plaintiff has stated a Fourth Amendment claim based on his allegations that the two officers unnecessarily prolonged the traffic stop by refusing to accept his license and apparently calling other officers to the scene, one of whom allegedly had a police dog.

The plaintiff also states a Fourth Amendment claim based on his allegations that Schmidt-Quist and Jaskowiak arrested him for resisting an

8

officer even though he says he was not resisting the officers and he had committed no offense. See Gonzalez v. City of Elgin, 578 F.3d 526, 537 (7th Cir. 2009).

"The nature and extent of the force that may reasonably be used to effectuate an arrest depends on the specific circumstances of the arrest, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Cyrus v. Town of Mukwonago, 624 F.3d 856, 862 (7th Cir. 2010). The plaintiff has stated a Fourth Amendment excessive force claim against Schmidt-Quist, Jaskowiak, DeBruin and Fish based on his allegations that they punched, kicked and tased him without justification. He also has stated a claim against the John Doe officer who handled the police dog, because he alleges that when he came to the dog was biting him; the court infers that the plaintiff means that the canine officer allowed the dog to bite him even though he was unconscious.

Finally, the plaintiff has stated a claim against Schmidt-Quist, Jaskowiak, Fish and DeBruin based on his allegations that they searched his vehicle after they arrested him. Nothing in the plaintiff's complaint suggests that the officers had probable cause to believe the vehicle contained evidence of criminal activity or that the plaintiff was within reaching distance of the vehicle at the time of his arrest. See U.S. v. Edwards, 769 F.3d 509, 514 (7th Cir. 2014).

9

Because the plaintiff is suing a John Doe defendant, he will need to use discovery (interrogatories and/or document requests directed to the named defendants) to learn the John Doe's name. Once he learns the John Doe's name, he must file a motion to substitute the name for the John Doe placeholder. The court then will order that defendant served with the complaint. The plaintiff may not serve discovery requests, however, until *after* the named defendants respond to his amended complaint and *after* the court has issued a scheduling order setting deadlines for discovery and the filing of dispositive motions. The defendants do not have to respond to any discovery requests the plaintiff serves before the court issues a scheduling order.

## II.   Conclusion

The court **ORDERS** that the plaintiff's motion to amend the complaint is **GRANTED**. Dkt. No. 45. The court **ORDERS** the clerk's office to docket the proposed amended complaint as the operative complaint. Dkt. No. 45-1 (to be supplemented with Dkt. No. 47).

The court **ORDERS** the U.S. Marshals Service to serve a copy of the amended complaint and this order on defendants Steven Fish and Jason DeBruin under Federal Rule of Civil Procedure 4. Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. §1921(a). Although Congress requires the court to order service by the U.S. Marshals Service, it has not made any provision for either the court or the U.S. Marshals Service to waive these fees. The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28

10

C.F.R. §§0.114(a)(2), (a)(3). The U.S. Marshals Service will give the plaintiff information on how to remit payment. The court is not involved in collection of the fee.

The court **ORDERS** defendants Jason DeBruin, Justin Schmidt-Quist, Stephen Jaskowiak and Steven Fish to file a responsive pleading to the amended complaint.

The court **ORDERS** that the parties may not begin discovery until after the court enters a scheduling order setting deadlines for discovery and dispositive motions.

The case remains referred to U.S. Magistrate Judge William Duffin for the handling of pretrial matters.

Dated in Milwaukee, Wisconsin, this 27th day of October, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**