UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

───────────────────────────────────────────────

JOSHUA LEE VINSON, SR.,

        Plaintiff,

    v.                                          Case No. 19-cv-1237-bhl

JASON DEBRUIN, et al.,

        Defendants.

───────────────────────────────────────────────

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

───────────────────────────────────────────────

       Plaintiff Joshua Lee Vinson, Sr., an inmate at the Columbia Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on claims arising under the Fourth and Fourteenth Amendments in connection with a February 19, 2015 traffic stop that culminated in Vinson's arrest. On August 13, 2021, Defendant City of Racine Police Officers Jason DeBruin, Justin Schmidt-Quist, Stephen Jaskowiak, Steven Fish, and Chad Melby filed a motion for summary judgment, which is fully briefed and ready for the Court's decision. For the reasons explained below, the Court will grant in part and deny in part Defendants' motion.

## BACKGROUND

**1.  Traffic Stop, Arrest, and Vehicle Search.**

       After midnight on February 19, 2015 in Racine, Wisconsin, Schmidt-Quist and Jaskowiak were driving in their marked squad car in full uniform when they observed a vehicle. Despite the vehicle not violating any traffic laws, the officers ran a license plate check and learned the vehicle had a suspended registration. Operating a vehicle without a valid registration is a violation of state law and Racine ordinances. Schmidt-Quist and Jaskowiak initiated a stop by activating the squad

car's overhead red and blue lights. They assert that they did not know Vinson's race at the time they initiated the stop. Dkt. No. 133 ¶¶9-13; Dkt. No. 101 ¶3; Dkt. No. 134 ¶5.

Before Schmidt-Quist exited the squad car, he observed that Vinson had his driver's license hanging out of the slightly rolled-down window. The officers exited their squad car, and Schmidt-Quist made contact with Vinson on the driver's side while Jaskowiak approached the passenger's side. The officers observed that Vinson appeared overly nervous as his hands were shaking. Vinson agrees that he was nervous. He states that he was confused and did not understand why he had been stopped given that he had not violated any traffic laws. Schmidt-Quist asserts that he introduced himself and identified himself as a police officer, but Vinson asserts that neither Schmidt-Quist nor Jaskowiak identified themselves as officers. Dkt. No. 133 ¶¶13, 18-19, 21; Dkt. No. 134 ¶8.

Schmidt-Quist ordered Vinson to keep his hands on the steering wheel and asked him if he was the owner of the vehicle. Vinson responded that the car belonged to his girlfriend. Because Vinson did not know if there was insurance on the car, Schmidt-Quist allowed him to call his girlfriend, who stated that she had AAA insurance but no proof in the car. Schmidt-Quist then told Vinson to hang up the phone. Vinson asserts that he complied, but Schmidt-Quist asserts that Vinson merely responded "ok" three times and stared blankly ahead. Dkt. No. 133 ¶¶23-27.

According to Schmidt-Quist and Jaskowiak, during this interaction Vinson's hand kept slowly drifting from the steering wheel to his right cargo pants pocket, which contained a large bulge. They assert that Vison would comply with orders to put his hands on the steering wheel, but then his hand would begin to drift toward his pocket again. Vinson denies that he had a bulky item in his pocket and denies that he repeatedly let go of the steering wheel. Dkt. No. 133 ¶¶29-30, 32.

2

Schmidt-Quist explains that, given Vinson's nervousness and his inability to comprehend or comply with simple instructions, he became concerned that Vinson may have a weapon, so he decided to remove Vinson from the car to perform a frisk for weapons. Schmidt-Quist asserts that he opened Vinson's door and said, "Keep your hands on the steering wheel. I am going to give you a series of instructions and it's important for you to listen to me." Vinson remembers Schmidt-Quist's comments differently. According to Vinson, Schmidt-Quist stuck his arm in the driver's side window, opened the door from the inside and said, "Get your Black ass out the car!" The parties agree that Vinson then broke his cell phone in half and grabbed the car door handle in an attempt to close the door, briefly trapping Schmidt-Quist's arm. Schmidt-Quist and Vinson struggled over the door, and the inside door handle eventually broke, allowing Schmidt-Quist to open the door. Dkt. No. 133 ¶¶31, 33, 35-37.

DeBruin had been in his squad car standing by in case Schmidt-Quist and Jaskowiak required assistance. When the struggle over the door began, DeBruin activated his emergency lights and approached the location of the stop. Schmidt-Quist explains that he was afraid Vinson was trying to access a weapon, so he entered the vehicle and placed all his weight on Vinson to keep him pinned in the vehicle and to restrict his movement so he could not access a weapon. Vinson denies that he was resisting, but Schmidt-Quist asserts that Vinson was flailing his hands and kept bringing his hands back towards his body. Dkt. No. 133 ¶¶39, 44-46.

Jaskowiak, who had been unsuccessfully trying to break the passenger side window, ran to the driver's side after DeBruin broke the back driver's side window. The parties have wildly different versions of what happened next. According to Schmidt-Quist and Jaskowiak, Vinson continued to resist despite numerous orders from officers to stop resisting. After about ten to fifteen seconds, Jaskowiak was able to lean through the back driver's side window and deploy his

3

taser in the lower left area of Vinson's back. Defendants assert that Vinson continued to fight with Schmidt-Quist, so Jaskowiak deployed his taser two more times. Eventually, DeBruin and Fish, who had recently arrived on the scene, were able to handcuff Vinson with his hands above his head. Schmidt-Quist then cut Vinson's seatbelt, and DeBruin and Fish removed Vinson from the car through the passenger's side door. Officers searched Vinson and found no weapons; Vinson had two candy bars inside his front pants pocket. While Vinson was being searched, Melby responded with his police dog Dozer, who performed a bark and guard. According to Melby, neither he nor Dozer ever had any physical contact with Vinson, nor did they participate in the search of Vinson's vehicle. Vinson was then arrested; this was about six minutes after his initial stop. Defendants explain that after Vinson was arrested, the vehicle was impounded, and an inventory search was performed. Dkt. No. 133 ¶¶50-76.

As noted, Vinson remembers his interactions with Defendants differently. According to Vinson, after Schmidt-Quist entered the vehicle through the driver's side door, he "punched and tased" Vinson even though he was not resisting. Vinson asserts that Schmidt-Quist told him to "shut the Fuck up," and when Jaskowiak entered through back window, he yelled "Black Motha Fucker! Shut up!" as he tased him. Vinson asserts that Jaskowiak tased him five times until he was no longer breathing. He also asserts that DeBruin punched him, and Fish tased him at the same time Jaskowiak tased him. Vinson explains that, once he was removed from the car, he "came back to life when [his] head hit the cement," and Fish picked him up off the ground, told him to shut up, and searched him. Vinson also asserts that Dozer bit him. Dkt. No. 133 ¶¶50-73; Dkt. No. 134 ¶13-20.

4

Case 2:19-cv-01237-BHL   Filed 03/17/22   Page 4 of 14   Document 135

**2. The Dashcam Video Shows Some but Not All of the Parties' Interactions.**

Schmidt-Quist and Jaskowiak's squad car's dashcam recorded the incident. Dkt. No. 101-1 (video not available on the docket). The video begins with the officers following Vinson's vehicle through several stoplights. There is no audio prior to the officers initiating the stop. Once the audio begins, one of the officers confirms the license plate number and says something that sounds like, "oh, wow, that's a great [indecipherable]," after which the other officer states, "another shit car." *Id.* at 23:10. The officers exit their vehicle, and Schmidt-Quist approaches the driver's side while Jaskowiak approaches the passenger's side. The audio does not capture the parties' interactions once the officers exit their squad car. The stop proceeds without incident initially, but about two minutes in, Schmidt-Quist calmly and slowly begins to open the driver's door at which point Vinson abruptly pulls the door shut, trapping Schmidt-Quist's arm between the door and the doorframe. Schmidt-Quist struggles to open the door, and once he does, he dives into the vehicle, across the front seats. Jaskowiak tries repeatedly to break the passenger's side window but is unsuccessful. Schmidt-Quist and Vinson's interactions inside the vehicle are not visible.

DeBruin arrives on the scene and breaks the back driver's side window. Jaskowiak runs to the driver's side and can be seen removing something—what we know to be his taser—from his belt, and he leans in through the back driver's side window. His actions inside the vehicle are not visible. DeBruin runs to the passenger's side window, breaks it, opens the door, and enters the vehicle. DeBruin's actions inside the vehicle are not visible. Other officers arrive on the scene, including Melby with his dog Dozer. Dozer can be heard barking; he does not enter the vehicle. Shortly after Melby and Dozer arrive, officers remove Vinson from the vehicle through the passenger's side door. The officers, Vinson, and Dozer move to the far-right side of the video

5

frame. The officers are visible, but the audio does not capture what they are saying. Vinson, who is surrounded by the officers, is not visible, but he can be heard yelling at the officers, saying comments such as "I know my rights!" Dozer is largely not visible, but he can be heard barking non-stop. At no time is he observed near the huddle of officers surrounding Vinson. Vinson can be heard shouting comments and questions at the officers, but he never yells in pain or otherwise indicates that Dozer is biting him. About a minute after Melby and Dozer approach the area where the officers are surrounding Vinson, they move away from that area, and Dozer is nowhere near Vinson after that. The rest of the video is largely uneventful. Officers search the vehicle while other officers lead Vinson away from the scene in handcuffs.

3. **Vinson Is Medically Evaluated after the Arrest.**

Vinson was transported to the hospital because he said he was having heart problems and wanted to see the doctor. According to Vinson, Schmidt-Quist and Jaskowiak mocked him and after they arrived at the hospital, they handcuffed him to the bed. Vinson asserts that he was made to lay in his own waste, and Jaskowiak threatened him not to tell anyone what had happened. Defendants dispute Vinson's version, explaining that when they got to the hospital, Vinson complained that he was schizophrenic and had fought with officers because aliens had told him to. They also assert that, once at the hospital, Vinson denied that he had other injuries that required medical attention. Dkt. No. 133 ¶¶77-81; Dkt. No. 134 ¶¶27-28.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A

6

dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Vinson is proceeding on claims that his Fourth Amendment rights were violated when Schmidt-Quist and Jaskowiak stopped his vehicle even though he was not committing any traffic violations and when they unnecessarily prolonged the stop by refusing to accept his license. Vinson also asserts that all Defendants violated the Fourth Amendment when they used excessive force while arresting him and searched his vehicle without proper justification. Finally, he asserts that Schmidt-Quist and Jaskowiak violated the Fourteenth Amendment when they discriminated against him because he is Black. Defendants dispute Vinson's claims. For the reasons explained below, the Court concludes that Defendants are entitled to summary judgment on some but not all of Vison's claims.

1. **No Jury Could Reasonably Conclude that Schmidt-Quist and Jaskowiak Violated the Fourth or Fourteenth Amendments When They Stopped Vinson's Vehicle.**

The Seventh Circuit has explained that it is permissible for officers to run a license plate check to confirm that a car is properly registered and that a traffic stop is justified when there is

7

Case 2:19-cv-01237-BHL   Filed 03/17/22   Page 7 of 14   Document 135

reasonable suspicion that an automobile is not registered. *United States v. Miranda -Sotolongo*, 827 F.3d 663, 667-68 (7th Cir. 2016). According to Schmidt-Quist and Jaskowiak, prior to initiating the stop of Vinson's vehicle, they ran a license plate check and learned the vehicle had a suspended registration. Schmidt-Quist and Jaskowiak explain that operating a vehicle without a valid registration is a violation of state law. Defendants agree that Vinson had not violated any traffic laws, but they highlight that was irrelevant to the reason they initiated the stop. Vinson offers no evidence to rebut Defendants' assertions that they ran the license plate check prior to initiating the stop. Given that Schmidt-Quist and Jaskowiak had probable cause to believe that Vinson was violating the law by driving a vehicle with a suspended registration, their decision to stop Vinson's vehicle did not violate the Fourth Amendment, and they are entitled to summary judgment on this claim.

Schmidt-Quist and Jaskowiak are also entitled to summary judgment on Vinson's claim that they stopped him because he is Black. *See Sherwin Manor Nursing Ctr. V. McAuliffe*, 37 F.3d 1216, 1221 (7th Cir. 1994) (holding that, to prevail on an equal protection claim, a plaintiff must prove that a state actor intentionally discriminated against him due to his membership in a protected class). Schmidt-Quist and Jaskowiak both assert that they were unable to determine Vinson's race until after they approached the vehicle. If they did not know he was Black at the time the initiated the stop, they cannot have taken his race into account when they made their decision. Vinson asserts that they are lying, but he offers no evidence to support his accusation. Vinson does not know what Schmidt-Quist and Jaskowiak were able to see or not see before they initiated the stop, and they both assert under penalty of perjury that they did not know he was Black until after they approached the vehicle. Vinson also asserts that, just before approaching his vehicle, an officer can be heard on the video using a derogatory and offensive term to describe

8

him, but no officer can be heard using such a term. Thus, because Vinson provides no evidence from which a jury could reasonably conclude that the officers' decision to pull over Vinson was influenced by Vinson's race, Schmidt-Quist and Jaskowiak are entitled to summary judgment on this claim.

**2. No Jury Could Reasonably Conclude that Schmidt-Quist and Jaskowiak Violated the Fourth Amendments by Unnecessarily Prolonging the Stop.**

The Supreme Court has emphasized that "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citations omitted). Thus, a justified seizure can become unlawful if it is unreasonably prolonged. *Id.* In this case, less than two minutes passed between the time Schmidt-Quist engaged Vinson and Vinson jerked the car door shut on Schmidt-Quist's arm. The parties agree that during those two minutes, Schmidt-Quist asked Vinson for the vehicle's registration and proof of insurance. And when Vinson was unable to produce proof of insurance and asked if he could call his girlfriend, Schmidt-Quist allowed him to do so. After Schmidt-Quist slowly and calmly opened the driver's side door, Vinson abruptly tried to slam the door shut, trapping Schmidt-Quist's arm. Any detention that occurred after Vinson tried to close the door was in response to Vinson's abrupt escalation of the interaction.

Even assuming Schmidt-Quist did not take Vinson's license through the cracked window during the initial two minutes of the stop, no jury could reasonably conclude that Schmidt-Quist unreasonably prolonged Vison's detention. Schmidt-Quist merely asked Vinson routine questions and allowed him to call his girlfriend, all of which is permissible under the Constitution. *See United States v. Muriel*, 418 F.3d 720, 725-26 (7th Cir. 2005) (explaining that an officer conducting a valid traffic stop may ask "a moderate number of questions" even if those questions

9

"do not concern the purpose of the stop and [] are not support by any other suspicions") (citations omitted). Schmidt-Quist and Jaskowiak are entitled to summary judgment on this claim.

3. **No Jury Could Reasonably Conclude that Melby Violated the Fourth Amendment by Using Excessive Force against Vinson.**

A claim of excessive force to effect an arrest is analyzed under the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985). The Court applies an objective reasonableness test, considering the reasonableness of the force based on the events confronting the defendant at the time and not on his subjective beliefs or motivations. *See Horton v. Pobjecky*, 883 F.3d 941, 949-50 (7th Cir. 2018) (citations omitted). Vinson asserts that Melby used excessive force when he allowed Dozer to bite his leg even though he was complying with the officers' instructions. Melby asserts that Dozer never bit Vinson and, in fact, never came within ten feet of Vinson. Based on the evidence in the record, no jury could reasonably believe Vinson's version.

At the summary judgment stage, [w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Thus, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The dashcam video clearly shows Vinson being pulled from the vehicle through the passenger's side door. Melby and Dozer move behind the car and just out of view on the bottom right side of the video's frame, but Dozer can be heard barking non-stop. Officers surround Vinson in the middle to top right side of the video's frame. Vinson is obscured by the officers surrounding him, but he can be heard talking loudly, asking the officers questions and making statements about

his rights. At no time does the huddle of officers surrounding Vinson move or react to accommodate the approach of Dozer, at no time does Dozer stop barking, and at no time does Vinson yell out in pain or otherwise indicate that Dozer is biting him. Just over a minute later, Dozer is seen walking behind Vinson's vehicle, away from where Vinson and the officers are standing.

Further, in support of his declaration, which he filed in response to the summary judgment motion, Vinson attaches reports summarizing a recorded interview he gave just weeks after the incident, on March 4, 2015, in support of a citizen's complaint he had filed with the Racine Police Department. In the interview, Vinson asserted only that the police dog "was trying to bite him," which is consistent with the dashcam video. Dkt. No. 130-1 at 13. He also complained that officers had injured his leg after he was transported to the hospital, so pictures of his right leg were taken. The pictures show a faint scrape to his right shin; there are no puncture or bite marks. *Id.* at 3-4.

Based on the video, Vinson's prior statements, and photographs taken shortly after the incident, the Court concludes that Vinson's assertions that Dozer bit him are contradicted by the record and no reasonable jury could believe his current assertions. Accordingly, Melby is entitled to summary judgment on this claim.

**4. Defendants Are Not Entitled to Summary Judgment on Vinson's Fourth Amendment Excessive Force Claim.**

As noted, the Court evaluates the reasonableness of the force used based on the totality of the circumstances confronting the defendants at the time. *See Horton*, 883 F.3d at 949-50 (citations omitted). Defendants explain that based on Vinson's lack of compliance with simple orders, his overly nervous demeanor, and his abrupt closing of the car door, they believed Vinson could have a weapon and that their safety was potentially in jeopardy. They further explain that after Schmidt-Quist entered the vehicle, Vinson resisted Schmidt-Quist's efforts to control his hands,

11

necessitating an escalation of force, which included Jaskowiak tasing Vinson three times. Vinson disputes that he failed to comply with officers' orders and disputes that he resisted Schmidt-Quist's efforts to control his hands. He asserts that despite his compliance with the officers' orders, Schmidt-Quist punched and tased him, Jaskowiak and Fish tased him, and DeBruin punched him. As noted, what the officers said and did inside the vehicle was neither audible nor visible on the dashcam video.

Were a jury to believe Vinson's assertions that Schmidt-Quist, Jaskowiak, Fish, and DeBruin used force against him even though he was complying with their orders, the jury could reasonably conclude that these Defendants' actions violated the Fourth Amendment. Accordingly, Schmidt-Quist, Jaskowiak, Fish, and DeBruin are not entitled to summary judgment on this claim.

### 5. Schmidt-Quist and Jaskowiak Are Not Entitled to Summary Judgment on Vinson's Fourteenth Amendment Equal Protection Claim.

To prevail on an equal protection claim, a plaintiff must prove that a state actor intentionally discriminated against him due to his membership in a protected class. *See Sherwin Manor Nursing Ctr. V. McAuliffe*, 37 F.3d 1216, 1221 (7th Cir. 1994). Although use of racially derogatory language on its own does not generally rise to the level of a constitutional violation, the use of such language combined with conduct that deprives an individual of his established rights may violate the Fourteenth Amendment. *See DeWalt v. Carter*, 224 F.3d 607, 612, n.3 (7th Cir. 2000); *see Burton v. Livingston,* 791 F.2d 97, 100 (8th Cir. 1986) ("[W]hen the racially derogatory language is coupled with conduct infringing the prisoner's right to security of his person, an inference arises that the conduct was motivated by racial bias.").

Schmidt-Quist and Jaskowiak deny that they made reference to Vinson's race in the course of arresting him, but Vinson asserts that Schmidt-Quist yelled, "Get your Black ass out the car!" and Jaskowiak yelled, "Black Motha Fucker! Shut up!" as he tased him. If a jury believed Vinson's

12

assertions that Schmidt-Quist and Jaskowiak highlighted his race in a derogatory manner while using unnecessary force against him, they could reasonably conclude that Schmidt-Quist and Jaskowiak violated Vinson's rights under the Equal Protection Clause. Accordingly, Schmidt-Quist and Jaskowiak are not entitled to summary judgment on this claim.

**6. No Jury Could Reasonably Conclude that Defendants Violated the Fourth Amendment When They Searched Vinson's Vehicle.**

After Vinson was arrested and removed from the scene, Defendants began a search of Vinson's vehicle. Vinson asserts that he did not consent to the search and, because he was unable to access the vehicle, Defendants had no constitutional justification to conduct the search. Defendants assert that, after Vinson was arrested, Schmidt-Quist impounded the vehicle because it was on the side of a public roadway without a valid registration. Dkt. No. 133 ¶73. Defendants then performed an inventory search per Department policy "to protect the safety of the Department personnel and to protect Plaintiff's property." Dkt. No. 96 at 13.

The Seventh Circuit has explained that a "warrantless inventory search is constitutionally permissible if (1) the individual whose possession is to be searched has been lawfully arrested and (2) the search satisfies the fourth amendment standard of reasonableness, i.e., it is conducted as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures." *U.S. v. Velarde*, 903 F.2d 1163, 1166 (7th Cir. 1990) (citations omitted). Vinson has produced no evidence rebutting Defendants' assertions that they conducted the inventory search in accordance with Racine Police Department standards in order to ensure that the intrusion was limited in scope and performed only to the extent necessary to carry out their caretaking function. Accordingly, no jury could reasonably conclude that Defendants impounding the vehicle and conducting a limited search to inventory the vehicle's contents violated the Fourth Amendment. Defendants are entitled to summary judgment on this claim.

**7. Vinson May Not Assert New Claims, Nor May He Sue New Defendants.**

Finally, Vinson submitted a declaration in support of his response to the summary judgment motion in which he stated, "I am also naming new defendants, and new action done by current defendants that violated my federally protected constitutional rights." Dkt. No. 130 ¶2. But a party may not raise a claim at summary judgment if he did not provide notice of that claim in the pleadings as required by Fed. R. Civ. P. 8. *See Grayson v. O'Neil*, 308 F.3d 808, 817 (7th Cir. 2002) (a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment (citations omitted)). Accordingly, Vinson may not assert new claims against current or new Defendants, and the Court has disregarded those parts of Vinson's declaration.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (Dkt. No. 94) is **GRANTED in part** and **DENIED in part** as set forth in this Order. **IT IS FURTHER ORDERED** that Defendant Melby is **DISMISSED** from this action. The Court will schedule a telephonic status conference with the parties to discuss next steps.

Dated at Milwaukee, Wisconsin on March 17, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge